### LYDIA AND J. R. COLLINGS v. NORTHWESTERN HOSPITAL.[1]

February 4, 1938.

Nos. 31,523, 31,524.

[1]Reported in 277 N. W. 910.

140

*Loring & Anderson,* for appellants.

*George Hoke, C. A. Taney, Jr.,* and *Wright W. Brooks,* for respondent.

GALLAGHER, CHIEF JUSTICE.

Action for personal injuries alleged to have resulted from the negligent administration to plaintiff Lydia Collings of a hypodermoclysis. There were verdicts for defendant in each case, and these appeals are taken from orders denying plaintiffs' motions for a new trial.

Plaintiff, a woman of about 60 years of age, was admitted to defendant hospital November 27, 1935, and two days later underwent a kidney operation. Shortly after the operation her physician ordered that a hypodermoclysis be given her. The technique to which that term applies consists of the introduction into the body of a patient of a solution composed of distilled water and common salt, known as normal saline solution, by means of a hollow needle, connected with the container of the solution by tubing, which is inserted through the skin in a region of the body having numerous lymphatic structures. The solution passes from the container through the tubing and needle and is deposited in the sub-skin tissue. From thence the lymphatic structures carry the fluid into the general circulatory system. The rate of flow of the solution is as a rule about five cc. a minute through one needle.

The physician's order was carried out by a hospital interne and nurse, and 1,000 cc. of normal saline solution was accordingly administered to plaintiff. On this occasion plaintiff was still under the influence of the ether used during the operation. As a result she has no memory of any pain or discomfort caused her by this procedure, although during its continuance she was given morphine because of pain. In this instance the solution was introduced into the pectoral region, just below the breast. She suffered no undesirable after-affects.

Two days later, December 1, her physician again prescribed a hypodermoclysis of 1,000 cc. The same interne, again assisted by a nurse, inserted a hollow needle in the front medial portion of each thigh. Plaintiff was conscious during this operation and almost immediately began complaining of intense pain. To relieve this, the interne added about 15 cc. of novocain to the solution. He then left the room, the nurse remaining in charge. About 45 minutes later the nurse telephoned the interne that plaintiff still complained of pain, and he ordered her to stop the hypodermoclysis. Soon afterward he visited plaintiff and discovered areas of puffed and discolored flesh about four inches in diameter around each of the places where the needles had been inserted. During the hypodermoclysis about 600 cc. of the solution had passed into plaintiff's body. In the course of the next few weeks the skin and subcutaneous tissue in those areas died and were cut out. In the craters thus formed skin was grafted, and both of them have since healed.

Plaintiff alleges that the death (necrosis) of these tissues was the result of defendant's negligence, and she seeks damages for the attendant pain and suffering and for permanent detriment resulting.

■ Plaintiff contends that there was sufficient evidence to support a jury finding that the solution used was not normal saline solution, but contained some other harmful ingredient. The trial court charged the jury that there was no evidence from which they could infer that normal saline solution was not used. Plaintiff assigns this instruction as error.

There was no direct evidence whatsoever that the fluid introduced into plaintiff's body was not normal saline solution. The flask containing it was so labeled, and the routine followed in its preparation and distribution is such as to make such a mistake unlikely. But it is asserted that the jury could infer from the facts that the interne did not test the solution before using it, that no test was made before the remainder of the solution was discarded after the termination of the hypodermoclysis, and that plaintiff suffered great pain because of its introduction into her body, that the solution used was not normal saline but was made of some substance actively destructive of tissue.

The fact that no test was made is no evidence that a harmful substance was present in the solution, nor is the fact that suffering accompanied its instillation into her body; the process is obviously of a character likely to cause pain.

There is no testimony that a normal saline solution interacts with human flesh in a destructive fashion. But medical experts for both sides testified that necrosis is not necessarily produced by an actively destructive substance. It may be induced by any condition obstructing or destroying the circulation of the body fluids through tissue. The function of the lymphatic structures of the body is to conduct fluids present in the tissue back to the circulatory system. If these conduits become obstructed or if the fluid content of the tissue is so great that the lymphs cannot perform their purpose, or if circulation is not strong enough to pump new fluid into the tissue, the tissue becomes waterlogged and is incapable of receiving new fluids from the circulatory system. Body cells require the materials carried by the blood for their sustenance and regeneration; without these substances they die. Thus an inert solution introduced into body tissue may be the cause of necrosis if the effect of its presence is to impede or block the circulation of the blood through that tissue.

At the time she entered defendant hospital plaintiff was more than 30 pounds overweight. She had undergone a serious operation the previous summer. At the time of her admittance she was suffering not only from a pathological kidney condition, but was

also afflicted with edema of the legs and ankles. During the kidney operation plaintiff of necessity lost a good deal of blood. To bring about a recovery, her physician deemed it advisable to introduce into her body a quantity of fluid to expedite blood building and to aid circulation. An accepted method of achieving this purpose in the circumstances existing after an operation is by hypodermoclysis.

The record discloses that sometimes a necrosis will follow a hypodermoclysis, although due care is used and no complicating factors are apparent. It is also fairly inferable from what has been said that the necrosis complained of here resulted from the edematous condition of plaintiff's thighs. Edema indicates that the tissues are overcharged with fluid and that the patient's circulation is not strong enough to correct it. The instillation of still more fluid into those tissues would have the effect of burdening the tissue to a further extent and of further curtailing circulation to those regions, with necrosis of those tissues as a result. It might be found that necrosis did not follow the first hypodermoclysis because there was no edema of plaintiff's pectoral region.

Despite the fact that the unfortunate result might by inference be attributed to other causes, plaintiff insists that the jury should have been permitted to infer from the fact that injury resulted that it was caused by some solution other than normal saline; and that the jury should have been permitted to infer further, from the "fact" established by this first inference, that defendant was negligent in administering this harmful solution.

This insistence is in effect, though not in terms, an assertion that the doctrine of *res ipsa loquitur* applies to this case, as the learned trial court points out in the memorandum attached to the order appealed from. That doctrine permits the inference of a fact from an occurrence when there is no other probable cause of the occurrence, as the cases plaintiff relies on hold. Schoepper v. Hancock Chemical Co. 113 Mich. 582, 71 N. W. 1081; Fish v. Grand Trunk Western Ry. 275 Mich. 718, 269 N. W. 568.

It is settled law in this state that negligence will not be presumed from the fact that treatment by a physician does not result

in a cure. Nelson v. Dahl, 174 Minn. 574, 219 N. W. 941; Johnson v. Arndt, 186 Minn. 253, 243 N. W. 67; Yates v. Gamble, 198 Minn. 7, 268 N. W. 670. When the injury might, with equal probability, have resulted from the acts of others as well as from the acts of defendant, proof of facts, other than that of injury, from which defendant's negligence can be inferred, must be made before the question can be submitted to the jury. Otherwise the verdict would be founded on mere speculation. Minneapolis S. & D. Co. v. G. N. Ry. Co. 83 Minn. 370, 86 N. W. 451. An inference of negligence based on an inferred fact of which there is neither evidence nor predominating probability cannot be safely made. Johnson v. Arndt, 186 Minn. 253, 243 N. W. 67; Masonite Corp. v. Hill, 170 Miss. 158, 154 So. 275, 95 A. L. R. 157, and note.

The trial court was correct in limiting the issue to the question whether defendant was negligent in failing to terminate the hypodermoclysis at an earlier time, and this issue was decided adversely to plaintiff.

■ A part of the court's charge is as follows:

"I want to add a couple of sentences. I may have said something in my charge that would be misunderstood by the jury.

"The position of the defendant in this case is: That there was no negligence (as I have defined negligence to you), no want of care on the part of anybody; that the result which this lady received following this hypodermoclysis was such as would happen with the best of care or with all the care that the law requires of a hospital.

Mr. Hoke: "Well, now and then—that is the usual—

The Court: "No, not usual. Something that will happen once in a while, even though proper care is used,—that that is the way it did happen in this case. They are not charging anybody else with negligence—nor themselves."

Plaintiff maintains, on the basis of an affidavit of nine of the jurors, that this instruction was misunderstood by the jury; that the jury understood this to be a statement of the law of the case instead of a statement of the position taken by one of the litigants.

Because of this, plaintiff claims that she was deprived of a fair consideration of her case and that she is therefore entitled to a new trial.

It is difficult to perceive how the jury could have misunderstood this part of the charge. But that consideration aside, affidavits of members of the jury tending to show misconduct by the jury are inadmissible in support of a motion for new trial. Hoffman v. City of St. Paul, 187 Minn. 320, 245 N. W. 373, 86 A. L. R. 198; State v. Hook, 176 Minn. 604, 224 N. W. 144. This rule includes an affidavit of a juror that he misunderstood the charge. State v. Cater, 190 Minn. 485, 252 N. W. 421.

The orders appealed from are affirmed.

